# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| PHILLIP "JUNIOR" SPEARS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:24-cv-00716 |
| | ) | Judge Aleta A. Trauger |
| WILSON COUNTY, TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM</u>

Before the court is the Motion for Summary Judgment (Doc. No. 23) filed by defendant Wilson County, Tennessee ("Wilson County" or the "County"), which seeks judgment in its favor on plaintiff Phillip Spears' claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8-50-103 *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, and 42 U.S.C. § 1983, for violation of the plaintiff's right to due process. For the reasons set forth herein, the motion will be granted in part and denied in part.

## I. STANDARD OF REVIEW – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## II.     FACTS AND PROCEDURAL HISTORY

Plaintiff Spears was employed for twenty years as a firefighter and EMT with the Wilson County Emergency Management Agency ("WEMA"), a department of Wilson County. (Doc. No.

31-6, Spears Dep. 18, 21–22;[1] Doc. No. 1, Compl. ¶ 11; Doc. No. 9, Answer ¶ 11.) His employment was terminated on June 14, 2023.[2]

In October 2022, Spears suffered a torn ACL and meniscus while on duty and was placed on worker's compensation leave. He underwent knee surgery in February 2023. By letter dated April 6, 2023, his treating orthopedist released him to return to light-duty work—specifically sedentary or desk duties—effective April 10, 2023.

According to the defendant, when Wilson County's benefits department contacted Spears about his return to light duty in early April 2023, Spears reported that a separate personal illness prevented his return to work, but he did not provide any information identifying the nature of that condition. (Doc. No. 23-1, Stockton Decl. ¶ 6; Doc. No. 23-2, Stockton Dep. 86–87.) Holly Stockton,[3] Risk & Benefits Manager for Wilson County (*see* Stockton Decl. ¶ 2), testified that, prior to Spears' termination, she was aware only that he had an ongoing illness that could take months to recover from (Stockton Dep. 91). Joey Cooper, WEMA Director in 2022 and 2023, testified that he learned by April 14, 2023 from an email from "risk management" that Spears had

---

[1] Most of the deposition transcripts filed in this case are in condensed format, with four pages per standard page. The court refers to them herein by their original pagination, rather than the pagination assigned by CM/ECF.

[2] The facts for which no citation is provided are drawn from the plaintiff's Response to Defendant's Statement of Undisputed Facts (Doc. No. 32) or the defendant's Response to Plaintiff's Statement of Additional Facts (Doc. No. 34) and are undisputed, at least for purposes of the Motion for Summary Judgment.

The court also notes that, prior to May 2025, the court's Local Rules authorized a party responding to a summary judgment motion to include with its response to the movant's statement of undisputed material facts a "concise statement of additional facts" that the non-movant believes are both material and disputed. L.R. 56.01(c) (Jan. 24, 2020). As amended in May 2025, the Local Rules no longer authorize such an additional statement of facts. *See* L.R. 56.01(e) (May 15, 2025). The defendant, however, did not object to the plaintiff's Statement of Additional Facts, so the court has considered them.

[3] Stockton's last name appears to have been Taylor at the time of the events in question. The plaintiff refers to her as "Taylor."

an unidentified medical condition (that he "had something going on") that could cause him to be off work for "several weeks or months." (Doc. No. 31-2, J. Cooper Dep. 91.)

According to the plaintiff, however, he notified Stockton on April 10, at the latest, that he had an illness that caused his spleen to swell, preventing him from returning to work as originally scheduled to on April 11, 2023 because he was at a high risk for rupture. (Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 4.) He testified that Stockton was the person he "reported to" and to whom he "emailed all [his] sick notes and stuff" and that, when he was released from the hospital after being diagnosed with norovirus, he "contacted Holly [Stockton] and told her what had happened and told her that . . . I was under another doctor's orders also. And I provided her a sick note and stuff by email and she stated that she would keep Director Cooper in the loop for everything." (Spears Dep. 47, 62.)

In an email dated April 14, 2023, Stockton informed Joey Cooper that Spears had called and told her he could not return to work that week on light duty (per his worker's compensation doctor) because he was "under another physician[']s care for an unrelated . . . condition." (Doc. No. 31-18 at 1.) Stockton reported that Spears had told her that he "wants to use his sick and annual leave until he is better which may take several weeks or months." (*Id.*) She purportedly told him that "if he is on continuous sick leave, he had to have a note stating that he is unable to work" and that it was "his responsibility to let his department know his status of being out." (*Id.*) According to this email, Stockton also told Spears that, since he was no longer out for worker's compensation leave and now was on sick leave "due to his personal condition," it was "not up to [her] to approve his sick time, that would be up to WEMA." (*Id.*) By "WEMA," she meant Cooper. (Stockton Dep. 94.) She testified that, when she spoke to Spears on the telephone, she told him that "he would need to let HR and Joey [Cooper] know of his ongoing personal illness." (*Id.*)

The plaintiff did provide a doctor's note on April 17, 2023, as directed. (Doc. No. 31-10 at 2.) The note confirmed that Spears had a doctor's appointment that day, had been under the practitioner's care since March 6, 2023, and, "pending progress," was anticipated to return to work on May 2, 2023. (Doc. No. 31-9.) Spears emailed that note to Stockton, and she forwarded it to Joey Cooper and Qiana Scruggs on April 17, 2023. (Doc. No. 31-20.) According to Stockton, she did not tell Spears that she would give his doctors' notes to Cooper and HR, aside from the April note. (Stockton Dep. 94.) According to Spears, Stockton never told him he needed to turn in doctor's notes to anyone other than her and that "her exact words [were] that she would keep the director and my shift commander in the loop." (Spears Dep. 48–49.)

Wilson County maintains that the April 17 doctor's note is the last medical documentation it received regarding the plaintiff's illness. (*See* Stockton Decl. ¶ 7.) The plaintiff maintains that there is a material factual dispute as to whether his physician sent a follow-up note on May 2, 2023, extending his leave until July 2023. (PRSF ¶ 5.) The plaintiff has introduced medical records from Vanderbilt University Medical Center ("VUMC") that include an office visit note for May 2, 2023 and a "To Whom It May Concern" letter signed by the plaintiff's physician and stating that the plaintiff was being treated at the VUMC clinic, had last been seen on May 2, 2023, and "should not be conducting work that in[v]olves physical contact and no heavy lifting" until his follow up appointment in "July 2023." (Doc. No. 31-21 at 2.) The letter's "Status" is designated as "Sent," but the record does not indicate where it was sent. (*Id.* at 1.)

For purposes of the Motion for Summary Judgment, the court accepts that the letter was sent, but no evidence in the record establishes that Wilson County actually received the letter.

Spears testified that the note was sent to Holly Stockton. (Spears Dep. 67–69.)[4] He also testified that, when he was terminated, he lost access to his WEMA email account where his communications with Stockton were stored. (*Id.* at 68.) Stockton, when shown the VUMC note during her deposition, testified that she had never seen it before. (Stockton Dep. 100–01.)

The plaintiff's timesheets from mid-April through mid-June 2023 are signed by his direct supervisor and the division chief. (Doc. No. 31-34 at 1–5.) The timesheet for the first two weeks of April 2023 contains a handwritten note that, as of April 10, Spears' continued leave should be designated as "SL" (sick leave) rather than workers compensation leave, "per Holly Taylor [Stockton]." (Doc. No. 31-34 at 1.) On the timesheets for April 1–13 and May 1–13, 2023, the boxes next to "Sick Note Attached" (providing options to check "Yes" or "No") are left blank. (*Id.* at 1, 3.) On the time sheets for April 16–28, May 16–28, and May 30–June 12," the box for "No" is checked next to "Sick Note Attached." (*Id.* at 2, 4–5.) It therefore does not appear that a doctor's note was attached to any of these timesheets, even though it is undisputed that the plaintiff had submitted a doctor's note excusing his absences through at least May 2, 2023.

Division Chief Shannon Cooper, when shown the VUMC doctor's note, did not recognize it and could not remember whether she had ever seen it. (Doc. No. 31-3, S. Cooper Dep. 104.) She could not recall whether there were "concerns" about Spears' not having provided a doctor's note to justify his sick leave. (Doc. No. 31-3, S. Cooper Dep. 107 ("Maybe. I don't know.").) She believed that she discussed with Spears that he needed a doctor's note in order to get paid. (*Id.*) And she was "sure the shift commander, at some point, needed a . . . medical note to attach to a timesheet. So that discussion would have happened too." (*Id.*) She also testified that she does not

---

[4] He testified that there were two notes, other than the April 17 doctor's note, that were sent to Stockton. It is not clear what other note he was talking about, but he may have been referring to a note from his worker's compensation doctor. (*See* Doc. No. 31-22.)

go through "every single" timesheet but depends on the "finance guy," Andy Street, to do that and to verify whether the necessary doctor's notes are attached. (*Id.* at 108.)

Eric Clinard, the plaintiff's shift commander at the time (Doc. No. 31-1, Clinard Dep. 8), testified that he would have attached any doctor's note given to him to the timesheets indicating that Spears was off on sick leave. (*Id.* at 67, 70.) It does not appear that Clinard was shown Spears' timesheets for April–June 2023 during his deposition, nor was he asked about the fact that none of them reflects that a doctor's note was attached. He testified that, generally, if an employee was on extended sick leave and did not have a doctor's note, he "would reach out to that employee" or "would most likely hear something from Holly," who, "most of the time she's like, 'I've got one. Here it is. I'll send it to you.'" (*Id.* at 42.) He stated, "with managing the shift, I . . . don't really ask, like, 'Where is the sick note,' unless . . . I'm prompted to because I . . . don't know where it's at in the system." (*Id.* at 42–43.) But generally, if an employee was telling him he was on sick leave but did not have a doctor's note, he would tell the employee that he needed a sick note to continue to have "coverage." (*Id.* at 43.) If the employee was continually out due to an illness but did not provide medical documentation, it would eventually "trigger the WEMA disciplinary procedures." (*Id.* at 46.) None of his supervisors ever told the plaintiff that his request for sick leave after May 2 was unsubstantiated or that the County had not received a doctor's note for leave after that date.

The plaintiff called Wilson County HR on June 8, 2023 to discuss his leave options. He claims that he was told that "there was a process [he] had to go through" to get FMLA leave. (Spears Dep. 37.) He was told that he only had about two weeks of sick leave left, and the person he spoke with "didn't know" if the process could be completed in that timeframe, so his best option was to "speak with the director about a leave of absence." (*Id.*) He was told that, if that did not

work, then he could come back to HR and they could "file the FMLA papers." (*Id.*; *see also* Doc. No. 31-4, Scruggs Dep. 61–62.) Spears still had approximately one and one-half months of vacation leave remaining at that time. (J. Cooper Dep. 131.) On the same day, Qiana Scruggs, HR Director, emailed Stockton and Joey Cooper to notify them that Spears had "called HR asking about FMLA." (Doc. No. 31-23 at 3.) According to this email, Spears "didn't want us [HR] to let Joey know that he called but since this may be a situation, I thought I needed to let you know. He did say that he was going to follow his chain of command to request a meeting with Joey concerning leave without pay." (*Id.*)

Spears met with Joey Cooper on June 12, 2023 to request a leave of absence. According to Spears, during this meeting, he asked Cooper to let him know if Cooper was "missing any of [the plaintiff's] sick notes" or any other paperwork he might need. (Spears Dep. 92.) The plaintiff testified that he told Cooper that, based on his doctor's notes, he believed he needed a leave of absence of an additional two to three weeks. (*Id.* at 94.) Cooper acknowledged during his deposition that the plaintiff told him that he was experiencing an ongoing illness that was keeping him from working, and he recalled that Spears said something about an enlarged spleen. (Cooper Dep. 111–12.) Cooper's handwritten notes from the June 12 meeting confirm that the plaintiff told him he had "neurovirus" and an enlarged spleen and was requesting a leave of absence through "July 18th." (*see also id.* at 127; Doc. No. 31-27 at 2.) Cooper's notes also indicate that he was aware at the time that the plaintiff still had 438 hours of annual leave time. (Doc. No. 31-27 at 2.) Cooper told Spears that he "had to think about" the request for a leave of absence and would get back in contact with Spears by the end of the day. (Spears Dep. 92.) Spears did not hear back from Cooper that day, however. (*Id.*)

Cooper testified that it is not his job to approve or deny an employee's request for FMLA leave. (J. Cooper Dep. 13–14.) Instead, FMLA leave is "an HR issue," and if an employee comes to him to discuss taking FMLA leave, he "direct[s] them to HR." (*Id.* at 14; *see id.* at 27.) However, if an employee is about to run out of sick leave, he would not "automatically" tell that employee to request FMLA leave. They would have to ask about it. (*Id.* at 28.) He claimed that if an employee came to him saying they were about to run out of sick leave but still had a medical condition, he would direct them to HR. (*Id.*) Cooper testified that, as of the day he met with Spears, he understood that Spears was eligible for and could request FMLA leave, but Cooper did not direct him to do so. (*Id.* at 113.) In Cooper's view, an employee has to use the words "reasonable accommodation" in order to trigger the FMLA or ADA accommodation process and the employer's obligation to engage in the interactive process. (*Id.* at 39–41.) Cooper's handwritten notes indicate that he was aware that the plaintiff was inquiring about FMLA leave. (Doc. No. 31-27 at 2.)

Also on June 12, 2023, Stockton responded to Scruggs' June 8 email about Spears' call, stating that the last physician note she had for Spears was dated April 17, 2023, was "not work comp related," and said he could return to work on May 2, 2023. (Doc. No. 31-23 at 4.) Stockton continued, "We are way past that date and I am not sure if he has turned in any additional physician notes to you [Scruggs] or Joey [Cooper] with dates beyond 5/2/2023. He is using his sick time for his absence (a full check) each pay period." (*Id.*) She also noted that the last time she had spoken to Spears, "he told me that he would send his physician out of work notes to Joey and that he was going to talk to Joey and HR about FMLA if he needed to be out longer tha[n] his sick and annual time allowed." (*Id.*)

Cooper responded, informing Scruggs and Stockton that Spears had come to Cooper to request a leave of absence and had also told Cooper that "yall," presumably meaning Stockton and Scruggs, had "said it would be a better option than FMLA." (Doc. No. 31-24 at 2.) Cooper, Stockton, and Scruggs scheduled a meeting for 10:00 a.m. on June 14 to discuss "this matter and options available." (*Id.* at 1–2.)

On June 14 at 3:30 p.m., Cooper emailed Spears (at his work email address) a Separation of Employment letter ("Separation letter"), notifying him that his employment with WEMA was terminated effective that day and that the termination decision was based on the plaintiff's "Excessive Absences without proper documentation, Unapproved leave, and Employment at Will." (*See* Doc. No. 31-25 at 4.) The Separation letter contained a timeline of events, specifically noting that the plaintiff had been on continuous leave since May 2, 2023 "without medical documentation to support continuous leave as of May 2, 2023" and stating: "As of today's date, June 14, 2023, Wilson County Government will no longer approve sick, annual, or compensatory leave for your continued absence without proper medical documentation." (*Id.* at 6.) The Separation letter did not provide Spears with the opportunity to provide such documentation before terminating him, however.

Spears contacted his shift supervisor when he had not heard from Cooper for a couple of days, stating that he did not have access to his work email. He provided Clinard his personal email address, to which Clinard forwarded the Separation letter. (*Id.* at 2.) Spears called Scruggs the next morning to indicate that he did not agree with the decision. Scruggs' email to Cooper states that she advised Spears to email Cooper and ask if there are any appeal procedures. (*Id.* at 2.)

Spears called and left a voice message for Cooper. His assistant, Valerie Griffin, emailed Cooper about it, and Cooper instructed her to "just call him back and state 'Director Cooper states

the separation stands with no other options.'" (*Id.* at 8.) Griffin later emailed Cooper to say that she had left a voice message for Spears "reading what you sent me." (*Id.* at 9.)

Spears emailed Cooper on Friday, June 16, 2023, requesting an appeal "because I am still under a Dr. care for workman's comp and for an illness that was out of my control." (Doc. No. 31-26 at 1.) He noted that he had spoken with "Division Chief [Shannon] Cooper" before speaking with Joey Cooper about additional leave, and she had assured him that, given his nineteen years of service, his "job was safe" and he would not be fired. (*Id.*) Spears stated that he had spoken with Stockton several times and that she "had all of [his] Dr. statements." (*Id.*) When he had asked her if he needed to speak to Director Cooper directly, Stockton "said she would email everything to [Cooper] and get it taken care of." (*Id.*) He also stated that he "had all the documentation that was sent to [Stockton] that, to [his] knowledge, was sent over to [Cooper]." (*Id.*)

Cooper responded on June 26, 2023 that the reasons given for the appeal (still under a doctor's care for worker's compensation, still under a doctor's care for illness, nineteen years of service, and "[c]ounty employees had knowledge of your case and sufficient paperwork") were "not valid reasons because these have all been answered in the Separation Letter." (Doc. No. 31-26 at 2.) Cooper also provided additional reasons for the separation, including violations of various WEMA policies relating to attendance and sick leave, and he reiterated that the agency was not in possession of "a statement or note which states the need to be off work." (*Id.* at 2–3.)

Cooper forwarded Spears' appeal email and Cooper's response to Stockton. She responded that, although Spears reported that he had sent her "all of his notes," the only doctor note she had received relating to his non-worker's comp-related illness was the note dated April 17, indicating a return-to-work date of May 2, 2023. (Doc. No. 31-26 at 4.) She also told Cooper that she had notified Spears that she would accept that one doctor's note but that, going forward, since his

illness was not worker's compensation related, he would need to go to Cooper directly. (*Id.*) She agreed that she was in possession of all of Spears' worker's compensation doctor's notes. (*Id.*)

It is undisputed for purposes of summary judgment that no one ever informed Spears after May 2 through the date of his termination that his absence after May 2 was unexcused because he had not submitted a doctor's note to support the requested leave. (Def.'s Resp. to Pl.'s Statement of Additional Facts, Doc. No. 34 ¶ 24.)

According to Wilson County, the plaintiff did not physically perform any work after September 20, 2022, because of his worker's compensation injury and then his illness, so he worked a total of approximately 840 hours between June 8, 2022 and June 7, 2023. (Stockton Decl. ¶ 10.)

The plaintiff filed this lawsuit in June 2024. As set forth above, he brings claims under the ADA, the TDA, the FMLA, and 42 U.S.C. § 1983. The defendant seeks summary judgment on all of these claims. Its motion (Doc. No. 23) is supported by a Memorandum of Law (Doc. No. 24) and Statement of Undisputed Material Facts (Doc. No. 25). The plaintiff responded to the motion (Doc. No. 30) and the Statement of Undisputed Material Facts (Doc. No. 32). He filed a Statement of Additional Facts (*id.*) to which the defendant responded (Doc. No. 34). The defendant also filed a Reply brief. (Doc. No. 33.)

## III. DISCUSSION

### A. The Plaintiff's ADA Failure to Accommodate Claim

#### 1. *ADA – Failure to Accommodate*

##### a) *Legal Framework*

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination under the Act is broadly defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise

qualified individual with a disability who is an applicant or employee," unless the covered employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A); *see also Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 415–16 (6th Cir. 2020); *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007). It is well established in the Sixth Circuit that failure to accommodate claims "necessarily involve direct evidence (the failure to accommodate) of discrimination," rather than indirect evidence, because, "if the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination." *Kleiber*, 485 F.3d at 868, *quoted in Nissan*, 951 F.3d at 416 .

Under the direct-evidence framework, Spears bears the burden of establishing "(1) [he] was disabled within the meaning of the ADA, (2) [he]was otherwise qualified for [his] position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about [his] disability; (4) [he] requested an accommodation; and (5) the defendant failed to provide the necessary accommodation." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 669 (6th Cir. 2020) (quoting *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018)). In addition, "[u]nder the ADA, an employer must engage in an 'informal, interactive process' with the employee to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Id.* (quoting *Brumley*, 909 F.3d at 840); *see also Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007)); 29 C.F.R. § 1630.2(*o*)(3) (describing the interactive process). "Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871. Generally "an employer is not responsible for a breakdown in the interactive process unless the employer actually

failed to offer a reasonable accommodation." *Kirilenko-Ison*, 974 F.3d at 669 (quoting *Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 788 (6th Cir. 2002)).

>           b)           *The Defendant's Knowledge of the Plaintiff's Disability*

The plaintiff here argues that his medical condition caused an enlarged spleen, at risk of rupturing, that prevented him from engaging in any kind of activity. (Spears Dep. 39–40.) The defendant does not dispute that the plaintiff qualifies as a person with a disability for purposes of his ADA claims. *See* 42 U.S.C. § 12102 (defining "disability"). (*See also* Stockton Dep. 38 (agreeing that, if "an employee has an enlarged spleen that's at a risk of rupturing, it would substantially limit a major life activity").) Nor does the County argue that Spears was not qualified for his position. Rather, it contends, first, that it did not know or have reason to know of his disability. (*See* Doc. No. 24 at 6 ("Plaintiff's ADA claim fails as a matter of law, because he did not inform Wilson County of his alleged disability . . . . An employer cannot be liable for failing to accommodate a disability of which it was not aware.").) The plaintiff responds that "Cooper, Scruggs, and [Stockton] admit they were aware of Spears' illness, including his enlarged spleen, that he was under the care of a physician and that it had caused him to be out of work for weeks or months and required additional time." (Doc. No. 30 at 15.)

Generally, "[a]n employer has notice of the employee's disability when the employee tells the employer that [s]he is disabled." *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 563–64 (6th Cir. 2022) (quoting *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999)). The employee is not required to use the word "disabled," "but the employer must know enough information about the employee's condition to conclude that [s]he is disabled." *Id.* (quoting *Cady v. Remington Arms Co.*, 665 F. App'x 413, 418 (6th Cir. 2016)). "Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." *Id.* (quoting *Cady*, 655 F. App'x at 418).

In this case, the plaintiff claims that, shortly after his diagnosis and being advised that he was at risk of a spleen rupture, he told Stockton "what had happened" and that he "was under another doctor's orders," and he "provided her a sick note and stuff by email." (Spears Dep.61–62.) He maintains that Stockton assured him she would "keep Director Cooper in the loop for everything." (*Id.* at 62; *see also id.* at 47–48.) Wilson County received the plaintiff's first note, keeping him off work until May 2, 2023. While there is no evidence that Wilson County actually received the May 2, 2023 doctor's note from VUMC, there is also no evidence that anyone from WEMA notified the plaintiff that it had *not* received the necessary documentation of his medical need to be off work, and his supervisors all apparently knew that he was off work for a medical condition. Director Cooper's notes from his meeting with the plaintiff on June 12 indicate that Spears told Cooper he had norovirus ("neurovirus") that caused his spleen to enlarge, that this was why he had been off work since mid-April, and that Spears anticipated needing to be off work through July 18. (Doc. No. 31-27 at 2.) Although the evidence presented by the plaintiff is not robust, and it is hotly disputed by the defendant, the court finds that the evidence, viewed in the light most favorable to the plaintiff, is sufficient to permit a factfinder to conclude that Wilson County knew or had reason to know of Spears' disability.

*c)      The Plaintiff's Request for an Accommodation*

The County also asserts that the plaintiff never actually requested an accommodation and that, even if his request for a leave of absence can be deemed to qualify as a request for an ADA accommodation, neither extended paid leave nor indefinite unpaid leave is a reasonable accommodation. (Doc. No. 24 at 6–8.)[5]

---

[5] Wilson County also appears to be arguing that the plaintiff failed to follow its specific written policy for requesting an accommodation, but the excerpt from the Wilson County Employee Handbook filed with its motion does not set forth any specific procedure. (*See* Doc. No. 23-5.) Moreover, the law is clear that, while an employer can require an employee to submit a

As for the first contention, the Sixth Circuit has repeatedly held that a request for medical leave (under the FMLA or not) can qualify as a request for an accommodation under the ADA. *See, e.g.*, *King*, 30 F.4th at 565–66 (finding a jury question as to whether the plaintiff's calls to her supervisors reporting that she "wanted medical leave to handle her asthma flare-up" and her calls to the employee's FMLA helpline to request FMLA leave—for which the plaintiff was ineligible— to deal with her asthma could qualify as requests for an accommodation in the context of an ADA failure-to-accommodate claim); *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 423 (6th Cir. 2015) ("Dr. Sharnowski's letter and Hurtt's FMLA leave request notified ISI that Hurtt sought accommodation in the form of time off from work."). The court finds that the plaintiff's request for a leave of absence due to medical reasons, specifically his enlarged spleen, qualified as a request for an accommodation.

The defendant insists that a request for extended paid leave, or for indeterminate leave, was *per se* unreasonable. (Doc. No. 24 at 7–8.) Under the ADA, "[o]nce an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018). Failure to engage in this mandatory interactive process amounts to an independent violation of the ADA "if the plaintiff establishes a *prima facie* showing that he proposed a reasonable accommodation." *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014).

---

written request and medical documentation to support a request for accommodation, it cannot simply ignore a verbal request. *Compare Woodie v. Motorola Sols., Inc.*, No. 24-3267, 2025 WL 754544, at *3 (6th Cir. Mar. 10, 2025) (finding that an employee cannot "sit on his hands and decline to follow [the employer's] Reasonable Accommodation Policy when his supervisors repeatedly directed him to do so"), *with King*, 30 F.4th at 564 ( "We have generally given plaintiffs some flexibility in how they request an accommodation. . . . Medical documentation is not required. A plaintiff's own requests, whether written or oral, can satisfy this element." (internal citations and quotation marks omitted).

Regarding Wilson County's assertion that a request for long-term *paid* leave was unreasonable, the plaintiff did not request extended paid leave. He inquired about *unpaid* leave under the County's leave of absence policy. (*See* Scruggs June 8, 2023 email, Doc. No. 31-24 at 4 ("He . . . was going to . . . request a meeting with Joey concerning leave without pay.").) Moreover, it appears that, by definition, leave under the County policy is without pay. (*See* Wilson County Government Employee Handbook § 3.11, Doc. No. 31-35 at 11 ("Employees may find that personal, health, or family problems make it necessary to be absent from work for extended periods. Management, depending on the reasons and circumstances for the request will consider requests for leaves of absence without pay for limited periods.").

And a request for an accommodation in the form of unpaid leave is not *per se* unreasonable. The Sixth Circuit has repeatedly held that unpaid medical leave can "constitute a reasonable accommodation under the ADA." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017) (citing *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 783 (6th Cir. 1998)); *see also Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1230 (6th Cir. 2022) ("Medical leave as an accommodation is not a novel concept." (quoting *Cehrs*, 155 F.3d at 783)); *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 618 (6th Cir. 2020). The question of whether a particular leave request is unreasonable is "a question of fact," and, if the employee's request is reasonable on its face, the employer bears the burden of showing that "special (typically case-specific) circumstances" give rise to "undue hardship in the particular circumstances," or that the "accommodation would eliminate an essential job requirement." *Blanchet*, 27 F.4th at 1229–30 (internal quotation marks and citations omitted).

The Sixth Circuit has also rejected the proposition that indefinite leave is *per se* unreasonable. *See Cehrs*, 155 F.3d at 783 (rejecting the suggestion that "an unpaid leave of

indefinite duration (or a very lengthy period, such as one year) could never constitute a 'reasonable accommodation'" and agreeing that such requests for "unpaid leave should [not] be analyzed differently from any other proposed accommodation under the ADA"); *see also Blanchet*, 27 F.4th at 1230 ("'[I]f an employer cannot show that an accommodation unduly burdens it, then there is no reason to deny the employee the accommodation." (quoting *Cehrs*, 155 F.3d at 782)).

In this case, the plaintiff testified that he proposed to Cooper to take an unpaid leave of absence of two to three weeks, until his treating physician could see him again and authorize his return to work. The burden, therefore, shifts to Wilson County to show that such a leave of absence would unduly burden it. It makes no effort to do so, and the court finds that there is at least a question of fact as to whether the plaintiff requested a reasonable accommodation, thus triggering the defendant's duty to engage in the interactive process. It did not do so. Instead, it denied the plaintiff's request and terminated his employment.

Wilson County is not entitled to summary judgment on the plaintiff's failure to accommodate claim under the ADA.

## B.    TDA Disability Discrimination Claim

The defendant's Memorandum does not separately address the plaintiff's TDA disability discrimination claims premised upon his termination. Instead, it simply asserts that Spears' TDA claims fail for the same reasons as his ADA claims. (Doc. No. 24 at 8.) The plaintiff, in response, acknowledges that a failure to accommodate claim is not cognizable under the TDA (*see* Doc. No. 30 at 18–19), but he argues that the defendant is not entitled to summary judgment on his discrimination claim, insofar as the claim is based on his termination rather than failure to accommodate.

The TDA prohibits "discrimination in the hiring, firing and other terms and conditions of employment" "based solely upon a physical, mental or visual handicap." Tenn. Code Ann. § 8-50-

103(b) (2014).[6] To establish a claim under the TDA, a plaintiff must show that (1) he was qualified for the position; (2) he was disabled; and (3) he suffered an adverse employment action because of that disability. *Hilliard v. Dolgencorp, LLC*, No. E2018-00312-COA-R3-CV, 2019 WL 1377263, at *9 (Tenn. Ct. App. Mar. 26, 2019) (quoting *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000)). However, as the plaintiff correctly observes, the TDA does not include a "reasonable accommodation" requirement. *Id.* (citing *Bennett*, 315 S.W.3d at 842).

The Tennessee courts have construed this to mean that, "[i]f a claimant needs an accommodation to be capable of performing the essential functions of the position, the claimant is not considered to be qualified for the job and may not look to the TDA for protection." *Black v. City of Clarksville*, No. M2020-01580-COA-R3-CV, 2022 WL 122615, at *5 (Tenn. Ct. App. Jan. 13, 2022) (citing *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 468 n.9 (6th Cir. 1999) ("A determination that an accommodation is required for the employee to perform the functions of the job ends the inquiry under Tennessee law . . . .")). Thus, if the plaintiff bringing a TDA claim "has a disability that renders him or her physically incapable of performing the essential functions of the position 'to some degree,' his or her claim fails as a matter of law." *Id.*; *see also Lopez v. Williamson Cnty.*, No. 3:24-cv-00245, 2026 WL 1068996, at *12 (M.D. Tenn. Apr. 20, 2026) (granting summary judgment on the plaintiff's TDA claim where there was "no dispute that the plaintiff could not have returned to work on June 13 without an accommodation" (citing *Black*, 2022 WL 122615, at *5)); *Earheart v. Cent. Transp. LLC*, No. 3:19-cv-01107, 2022 WL 1445220, at *15–17 (M.D. Tenn. May 6, 2022) (Richardson, J.) (granting summary judgment for the

---

[6] The TDA was amended in 2025. 2025 Tenn. Laws Pub. Acts, Ch. 471 § 17, eff. May 12, 2025.

defendant where it was undisputed that the plaintiff could not perform his job without an accommodation).

In this case, because it is undisputed that the plaintiff could not perform any of his essential job functions at the time he requested an accommodation, his TDA claim fails as a matter of law.

## C. ADA Discrimination Claim

Under the ADA, covered employers are prohibited from discriminating against a "qualified individual on the basis of disability" with regard to hiring, advancement, training, termination, and "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). An ADA discrimination claim may be supported by either direct or indirect evidence. A claim that relies on indirect evidence is analyzed under the familiar *McDonnell Douglas* burden-shifting framework.

The Sixth Circuit has indicated that, when a failure to accommodate "leads to discharge for performance inadequacies resulting from the disabilities," the failure to accommodate is considered direct evidence of discharge "because of" an employee's disability, in violation of the ADA. *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 460 (6th Cir. 1997); *see also Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (holding that the "direct test is the correct approach when an employer rescinds a reasonable accommodation"). The court finds that the plaintiff has presented direct evidence of disability discrimination premised upon his termination for the same reasons as those set forth above in connection with his failure to accommodate claim. He qualifies as "disabled"; the employer knew or had reason to know of his disability; he was "otherwise qualified" for his position despite his disability, with a proposed reasonable accommodation; and the defendant has failed to present evidence sufficient to show that the proposed accommodation would impose an undue hardship upon it. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016), *abrogated on other grounds by Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019). In this situation, the *McDonnell Douglas*

burden shifting framework is not applicable, and the plaintiff is not obligated to present evidence sufficient to establish that the defendant's proffered non-discriminatory reason for its action is pretext for discrimination.[7]

Material factual disputes abound, as set forth above, and the defendant is not entitled to summary judgment on the ADA discrimination claim based on the plaintiff's termination.

### D.        The Plaintiff's Eligibility for FMLA Leave

The Complaint sets forth claims for FMLA interference and FMLA retaliation. (Compl. at 10.) The plaintiff alleges that he was entitled to FMLA leave and that Wilson County interfered with his right to FMLA leave when it failed to provide him notice of his rights, to provide the paperwork to apply for FMLA leave, and actively discouraged him from applying for FMLA leave. (*Id.* ¶¶ 77–78.) He also asserts that he was terminated in retaliation for "inquir[ing] about applying for FMLA leave." (Compl. ¶ 84.) The defendant moves for summary judgment on the plaintiff's FMLA claims on the grounds that he had not worked the requisite number of hours during the twelve months preceding his FMLA inquiry, was not eligible for FMLA leave, and therefore is not entitled to relief under the FMLA. In the alternative, Wilson County also argues that the plaintiff cannot show that he "engaged in protected activity" under the FMLA and "cannot establish that there was a causal connection between any protected activity and his termination." (Doc. No. 24 at 8.) The plaintiff maintains that material factual disputes preclude summary judgment.

---

[7] The claim would survive summary judgment under the *McDonnell Douglas* burden-shifting framework as well, for the same reason that his retaliation claims survive, discussed below: he has presented sufficient evidence to create a material factual dispute as to whether the County's proffered reason for terminating him is pretextual.

### 1.    Interference

To establish an interference claim, the plaintiff must present sufficient evidence to establish that: (1) he was an "eligible" employee; (2) the defendant was an employer as defined under the FMLA; (3) the plaintiff was entitled to leave under the FMLA; (4) he gave the defendant notice of his intention to take leave, and (5) the defendant denied or interfered with FMLA benefits to which the plaintiff was entitled. *Jackson v. U.S. Postal Serv.*, 149 F.4th 656, 667 (6th Cir. 2025); *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014).

"To be eligible for FMLA leave, employees must have worked at least 1,250 hours in the past year." *King*, 30 F.4th at 556. Sixth Circuit law is clear that an employee who is not eligible for FMLA leave cannot prevail on a claim for FMLA interference. *See, e.g.*, *Banerjee v. Univ. of Tenn.*, 820 F. App'x 322, 327 (6th Cir. 2020); *Davis v. Mich. Bell Tel. Co.*, 543 F.3d 345, 350 (6th Cir. 2008) ("[A]n employee's ineligibility precludes the employee from pursuing an FMLA interference claim."); *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008) ("Staunch was not an 'eligible employee' under the FMLA and her FMLA claims fail as a matter of law.").

The plaintiff points to evidence suggesting that various Wilson County employees believed that the plaintiff was eligible for FMLA leave, but their subjective beliefs, particularly when the plaintiff had not actually submitted a request to take FMLA leave, do not overcome the unrebutted evidence presented by the defendant on summary judgment that the plaintiff had not worked 1,250 hours over the course of the preceding year. The plaintiff was not eligible for FMLA leave, and the defendant is entitled to summary judgment on the plaintiff's FMLA interference claim.

### 2.    Retaliation

Up until recently, the Sixth Circuit had repeatedly held that, "if one is not eligible for FMLA leave, one cannot maintain a cause of action for FMLA retaliation." *Banerjee*, 820 F. App'x at 327 (citing *Davis*, 543 F.3d at 354; *Staunch*, 511 F.3d at 631; *Humenny v. Genex Corp.*, 390

F.3d 901, 906 (6th Cir. 2004)). In 2023, however, the court expressly distinguished between retaliation claims premised upon a plaintiff's having *taken* leave to which she was not entitled under the FMLA and claims premised upon merely *inquiring* about FMLA leave. It held that, in the latter situation, eligibility for FMLA leave is not a necessary element of the claim. *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 868 (6th Cir. 2023). In *Milman*, the precise question presented was "whether the FMLA protects the right of an employee to inquire about and request leave even if it turns out that she is not entitled to such leave." *Id.* To answer that question, the court turned to "the plain language of the statute." It explained as follows:

> The FMLA's language . . . requires employees to put their employers on notice of their desire to use their unpaid leave by making a formal request to the employer. 29 U.S.C. § 2612(e). This is the first step in the process contemplated by the FMLA's procedural framework. . . . Because this process facilitates both employees' access to their statutory right to take unpaid leave and employers' ability to assess the validity of an FMLA request, the entirety of the process must be harmonized with the statute's provisions entitling employees to leave. To do so here, the steps of the process created by the FMLA—including the first step, *i.e.*, the employee's initial request for leave—must be protected activity under the Act. FMLA rights and the statute's purpose would be significantly diminished if employers could fire an employee who simply took the required initial steps to access FMLA leave.

*Id.* at 868–69 (some internal citations omitted). The example provided in *Milman* establishes that the plaintiff in the present case engaged in activity protected by the FMLA:

> Suppose that an employee, intending to exercise her FMLA rights, meets with her employer and asks questions concerning her FMLA rights, then is fired for doing so. Concluding that no FMLA violation could occur if it turns out that the employee is not entitled to leave would render the employee unprotected during the step required to initiate the FMLA's process. Without protection, employees would be discouraged from taking authorized initial steps—including preparing or formulating a request—to access FMLA benefits.

*Id.* at 869.

This is very close to the factual scenario the plaintiff alleges here: he met with Joey Cooper to request a leave of absence while also indicating that he would like to take FMLA leave if a leave

of absence was not approved. The plaintiff alleges that he was fired in retaliation for making this inquiry. The fact that he was not eligible for FMLA benefits does not preclude this claim.

### E.  Retaliatory Termination—ADA and FMLA

Counts II and V of Spears' Complaint assert claims of retaliation in violation of the ADA and the FMLA. Wilson County moves for summary judgment on these claims, arguing that the plaintiff cannot show that he engaged in protected activity and cannot establish a causal connection between any protected activity and his termination, because the undisputed facts show that he was terminated due to his failure to provide required documentation and maintain communication with his employer. It asserts that the plaintiff cannot show that the reason for his termination—"[t]he failure to adequately follow WEMA policy and provide the necessary documentation regarding his extended leave"—is pretext for retaliation (or discrimination). (Doc. No. 24 at 9.)

The plaintiff argues both that he has direct evidence of discrimination, which eliminates the need to apply the *McDonnell Douglas* burden-shifting framework, and that material factual disputes preclude summary judgment even under the *McDonnell Douglas* framework. More specifically, regarding his FMLA retaliation claim, the plaintiff points to evidence that, when Cooper, Scruggs, and Stockton discussed his termination, they also discussed his request for FMLA leave, and Cooper also testified that, if Scruggs had not contacted him about Spears' inquiry about FMLA, he would not have been aware of Spears leave from May 2 through June 14 or any alleged issues with his leave. (Doc. No. 30 at 22 (citing J. Cooper Dep. 109–11).) He also argues that a discussion about his request for an accommodation and medical conditions when making the termination decision constitutes direct evidence of ADA retaliation. (*See id.* at 17.) He also, as discussed below, points to evidence that he characterizes as supporting a finding that Wilson County's proffered reasons for terminating him are pretext for discrimination.

The defendant's Reply focuses almost entirely on the fact that the County's records do not contain any medical documentation for the plaintiff's absences after May 2 and the undisputed fact that, based on the absence of medical documentation, the plaintiff was not in compliance with County policy. The court, in short, is not persuaded.

Applying the *McDonnell Douglas* framework, to establish a *prima facie* case of retaliation under the ADA or FMLA, a plaintiff must show that (1) he engaged in protected activity; (2) the defendant knew he engaged in protected activity; (3) he was subjected to an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. Requesting an accommodation and inquiring about FMLA leave, as discussed above, are protected activities under the respective statutory schemes. *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013) (ADA); *Milman*, 58 F.4th at 868–69 (FMLA). There are material factual disputes as to whether the plaintiff engaged in protected activity. For the second element, there are also disputed facts as to whether the defendant knew he engaged in protected activity. The plaintiff's termination obviously qualifies as an adverse employment action.

To establish a causal connection at the *prima facie* stage, the fourth element, the plaintiff's burden is "minimal, requiring merely that [he] put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity." *A.C. ex rel. J.C.*, 711 F.3d at 699 (citation and internal quotation marks omitted). "To show causation, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct." *Kirilenko-Ison*, 974 F.3d at 664 (citation and internal quotation marks omitted). "In some circumstances, an inference of causation may arise solely from the closeness in time between the point at which an employer learns of an employee's

protected activity and the point at which it takes an adverse action against that employee." *Id.*; *see also Paris v. MacAllister Mach. Co.*, 175 F.4th 787, 802 (6th Cir. 2026) (for purposes of an FMLA claim, where the plaintiff was fired a couple of weeks after he made an FMLA inquiry, recognizing that "such close temporal proximity between a protected activity and an adverse employment action can support an inference of retaliation"). In this case, the plaintiff was terminated two days after engaging in protected conduct. This is sufficient to show causation for purposes of his *prima facie* case.

The defendant has set forth a legitimate, non-retaliatory reason for the termination decision: the plaintiff's failure to support his medical absence with documentation. To show that this proffered reason is pretext for retaliation, the plaintiff must present evidence from which a jury could conclude that the proffered reason is pretextual. "The plaintiff does not need to prove pretext; she only needs to show that the question of pretext is a genuine factual dispute." *Kirilenko-Ison*, 974 F.3d at 667 (citing *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)). "Notably, this burden on the plaintiff 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Thus, on summary judgment, "[i]n evaluating pretext and the plaintiff's ultimate burden, the court should consider all [probative] evidence in the light most favorable to the plaintiff, including the evidence presented in the *prima facie* stage." *Id.* (quoting *Provenzano*, 663 F.3d at 812). Generally, to establish pretext, the plaintiff must come forward with some evidence from which a reasonable jury could conclude that the defendant's proffered reason had "no basis in fact, did not motivate the adverse employment action, or was insufficient to motivate the action."

*Greer v. Cummins, Inc.*, No. 22-5663, 2023 WL 9472037, at *3 (6th Cir. Oct. 23, 2023) (citing *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)).

In support of pretext, the plaintiff appears to be arguing either that the proffered reason did not really motivate the decision or was not sufficient to motivate it. He points out that: (1) Cooper admitted that he did not ask any of Spears' direct supervisors about whether they had medical documentation to support Spears' sick leave after May 2 before making the termination decision (J. Cooper Dep. 116, 131); (2) Spears still had approximately one and one-half months of annual leave time left at the time of his termination, which would have covered the additional leave time he proposed (Doc. No. 31-27); (3) Cooper never discussed with Spears any issue of excess absenteeism; he did not advise the plaintiff that his sick leave was unsupported or that he was at risk of termination due to the lack of medical documentation; nor did he give Spears the opportunity to submit the missing medical documentation (J. Cooper Dep. 119–20, 134); (4) prior to Cooper's meeting with Scruggs and Stockton, none of the plaintiff's supervisors had complained about the lack of medical documentation or unexcused absences, and they considered his sick leave to be approved (S. Cooper Dep. 103; Clinard Dep. 94); (5) there is no evidence that any HR employee had contacted Spears regarded his alleged unexcused absences or the missing medical documentation; (6) Cooper did not ask Scruggs or Stockton to contact Spears for medical documentation to support his leave from May 2 through June 14 or for the additional time the plaintiff was requesting (J. Cooper Dep. 107); (7) the plaintiff was never subjected to progressive discipline for failing to submit medical documentation; (8) the plaintiff's timesheets through mid-June reflected that he was on sick leave (albeit apparently without documentation) (Doc. No. 31-34); (9) Spear's absence through June 14 had not caused Wilson County any particular hardship, and no one discussed whether additional leave would cause it undue hardship (J. Cooper Dep.

120–21); and (10) the County had allowed other firefighters and EMTs to remain out on leave for over a year for non-FMLA-qualifying and non-medical reasons (*id.* at 31–33). (*See* Doc. No. 30 at 17–18.)

The court finds this evidence sufficient to permit a jury to find that the plaintiff was not terminated because of his failure to provide medical documentation and that this reason was pretext for discrimination or retaliation. It is clear from the record that the plaintiff believed that he had presented medical documentation, even if Wilson County never actually received his second doctor's note, and no one at Wilson County notified him to the contrary. His supervisors believed that he was on excused leave, and Joey Cooper had no reason to know otherwise until the plaintiff requested a leave of absence. Under these circumstances, the defendant is not entitled to summary judgment on the plaintiff's retaliation claims.

### F. Due Process Claim

Finally, the defendant moves for summary judgment on the plaintiff's due process claim, which is premised upon his being terminated without the opportunity for a hearing before his termination or an appeal after his termination. (Compl. Count VI.)

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The due process clause has both procedural and substantive components." *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). Here, the plaintiff raises a procedural due process claim under 42 U.S.C. § 1983.

"To state a claim for a procedural due process violation in the employment context, a plaintiff must show he had a property interest in continued employment, and he was not provided the constitutional minimum of due process before termination." *Gratsch v. Hamilton Cnty.*, 12 F. App'x 193, 205 (6th Cir. 2001) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541–

42 (1985)). A legitimate claim of entitlement "must be grounded in some statute, rule, or policy." *Hughlett v. Romer–Sensky*, 497 F.3d 557, 567 (6th Cir. 2006). "Whether a person has a 'property' interest is traditionally a question of state law." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)); *see also Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Under state law, "[a] property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." *Ludwig v. Bd. of Trs.*, 123 F.3d 404, 409 (6th Cir. 1997) (citations omitted). "A statute or contract providing that employees may be disciplined or terminated only for 'just cause' creates a property interest." *Rodgers v. 36th Dist. Court*, 529 F. App'x 642, 647–48 (6th Cir. 2013) (citing *Loudermill*, 470 U.S. at 538–39). To establish that he has a property interest at stake here, the plaintiff must show more than "[a] mere 'unilateral expectation' of continued employment." *Kennard v. Wray*, 19 F.3d 19 (Table), 1994 WL 56932, at \*4 (6th Cir. Feb. 24, 1994) (per curiam). He must establish a "legitimate claim of entitlement" to his position. *Roth*, 408 U.S. at 577.

The defendant argues that Spears was an at-will employee with no property interest in his employment. It also contends that he was not deprived of due process because he "received adequate notice of the documentation requirements and the consequences of failing to comply." (Doc. No. 24 at 10.) The plaintiff responds that property rights may be created by an employer's policies and practices and that a "policy or custom may be found in . . . 'persistent . . . practices of . . . officials . . .'" (Doc. No. 30 at 23 (alterations in original) (quoting *Irizarry v. Cleveland Pub. Libr.*, 727 F. Supp. 357, 361 (N.D. Ohio 1989)).)

*Irizarry*, however, involved a public employee whose employment agreement with the Cleveland Public Library was expressly governed by a Personnel Manual that guaranteed "continuous and permanent employment (tenure) so long as [the employee's] duties are performed

satisfactorily" and expressly provided that "[n]o tenured employee may be dismissed without due process, including the filing of written charges and a formal hearing before the Director (or his/her designee) at which the employee shall have the right to Legal Counsel." *Irizarry*, 727 F. Supp. at 358–59.

In this case, conversely, the Wilson County Employee Handbook ("WCEH") states unequivocally that employment by Wilson County is "at-will for an indefinite period of time, until terminated either by the County or the employee, with or without cause." (Doc. No. 31-11 at 15, WCEH § 1.6.) To emphasize that point, the WCEH further explains that

> either party may end the relationship. No written or oral representation by Wilson County personnel will create a contract of employment. No employment practice of Wilson County is intended to create a contract of employment. No changes in the County's employment-at-will policy will be effective unless executed in writing and signed by the County Mayor as approved by government body [sic], an authorized representative of Wilson County. This County's employment guidelines are intended only as an explanation of its employment practices, policies, benefits, and a general guide to working for this County. They do not represent contractual terms of employment. Despite anything that the employee may read into any Wilson County material, employment at this County is strictly at-will. Management is entitled to modify, revoke, or replace any policies and procedures at any time. None of Wilson County's policies are meant to serve as an employment contract.

(*Id.*) Under Tennessee law, an at-will employee, even one employed by a government body, does not have a protected property interest in his employment. *Keller v. Casteel*, 602 S.W.3d 351, 361 (Tenn. 2020).

In *Keller*, the Tennessee Supreme Court recognized that "[e]mployers, including governmental employers, may adopt policies and procedures to promote efficiencies and fair, consistent treatment of employees, and may put those policies and procedures in employee manuals or handbooks," but, absent "specific language showing the employer's intent to be contractually bound, such policies and procedures do not change employees' at-will status and do not create a constitutionally protectable property interest." *Id.* at 353. In that case, as here, the

municipality's personnel manual contained detailed appeal procedures for city employees who had been disciplined or terminated. *Id.* at 358. But it also "included an explicit statement that the municipality did not intend the procedures [in its employee handbook] to be binding or constitute any type of contract." *Id.* at 353, 358. The court found that "[s]uch disclaimers preclude any finding that the employer intended to be bound by the terms of the employee handbook" and did not create a property interest in government employment. *Id.* at 353, 362.

The fact that Tennessee does not recognize a property interest under these circumstances is dispositive of the plaintiff's due process claim. *Accord Handy-Clay v. City of Memphis*, 695 F.3d 531, 547 (6th Cir. 2012) ("Under state law, which defines what constitutes a property interest, an at-will employee is subject to dismissal at any time and without cause and, thus, has no protectable interest in her continued employment." (quotation marks and citations omitted)).) The defendant is entitled to summary judgment on the plaintiff's due process claim.

## IV.    CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment (Doc. No. 23) will be granted in part and denied in part. The defendant is entitled to summary judgment on the plaintiff's due process, TDA, and FMLA interference claims, and those claims will be dismissed. The motion will be denied with respect to the plaintiff's ADA discrimination, failure-to-accommodate, and retaliation claims and his FMLA retaliation claim. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge